# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 22-1396V

SHERRY MATTHEWS,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

Chief Special Master Corcoran

Filed: May 15, 2024

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA,* for Petitioner.

*Benjamin Rex Eisenberg, U.S. Department of Justice, Washington, DC,* for
     Respondent.

### RULING ON ENTITLEMENT[1]

On September 28, 2022, Sherry Matthews filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving influenza ("flu") and pneumococcal conjugate vaccines on November 16, 2020. Petition at 1, 1 n.2, ¶ 2. She asserts that she first noticed her left shoulder pain when she awoke the next morning. *Id.* at ¶ 2.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent disputes Petitioner has established pain onset timing consistent with the requirements of a Table SIRVA. For the reasons discussed below, I find that the onset of Petitioner's left shoulder pain occurred within 48 hours of vaccination, and that she has satisfied the other requirements of a compensable Table SIRVA injury. Petitioner is thus entitled to compensation under the Vaccine Act.

## I.    Relevant Procedural History

A few days after the claim's initiation, Ms. Matthews filed declarations from herself, her son, her neighbor, and an attorney for whom she worked as an independent contractor,[3] plus the medical records required under the Vaccine Act. Exhibits 1-15, filed Oct. 4, 2022, ECF Nos. 6-7; *see* Section 11(c). On November 17, 2022, the case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 11.

Approximately ten months later, on September 20, 2023, Respondent expressed a willingness to engage in settlement discussions. ECF No. 21. Having previously filed updated medical records,[4] Petitioner provided Respondent with a demand on November 17, 2023. ECF No. 24. Approximately two months later, however, the parties informed me that they had reached an impasse. ECF No. 26.

On March 14, 2024, Respondent filed his Rule 4(c) Report opposing compensation. ECF No. 27. Emphasizing the more general description of pain onset Petitioner initially provided and amount of time (five and one-half months) that had passed before her more specific description provided to the orthopedist, Respondent insisted that Petitioner had failed to establish the pain onset needed for a Table SIRVA. *Id.* at 5-6.

The matter is now ripe for adjudication.

## II.    Finding of Fact Regarding Onset

At issue is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a) XII.A. (pneumococcal conjugate vaccination) & XIV.B.

---

[3] All declarations were signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibits 10-15.

[4] Petitioner filed her updated medical records on August 7 and 30, 2023. Exhibits 16-18, ECF No. 16; Exhibit 19, ECF No. 18.

(influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

## A.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.   The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y*

*of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8; *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## B.   Analysis

I make the onset finding after a complete review of the record to include all medical records, affidavits or declarations, and additional evidence filed. Specifically, I base the findings on the following evidence:

- Prior to vaccination, Petitioner (a massage therapist) suffered from high blood pressure, arthritis, back and pain, muscle cramping and spasms, and high blood pressure. Exhibit 2 at 21-43.[5] In June 2020, Petitioner experienced a fall and injury to her left thumb. Exhibit 4 at 6; *see also* Exhibit 2 at 22-26 (primary care provider ("PCP") visit to discuss x-ray results).

- Since 2016, Petitioner has sought chiropractic treatment for her thoracic and back pain. Exhibit 3 at 1-26. X-rays, taken in late January 2020, revealed degenerative disease "at multiple levels within the mid-thoracic

---

[5] I will cite to all exhibits in this case using the pagination as shown in the Bates stamp entries which differs by one page from the pagination provided by CM/ECF.

spine." Exhibit 4 at 5. Petitioner has taken one 100mg tablet of Celebrex[6] twice daily since early 2020. Exhibit 2 at 20, 22, 27, 32.

- On November 16, 2020, Petitioner received the flu and pneumococcal conjugate vaccines intramuscularly in her left deltoid at a Rite Aid Pharmacy. Exhibit 1; Exhibit 5 at 8-9.

- Approximately two months later, on January 19, 2021, Petitioner visited her PCP for multiple issues, including left arm pain. Exhibit 2 at 15. She reported that she "had a shot in left arm on 11-16-2020 . . . [n]ow she is having problems lifting the arm/painfull [sic]." *Id.* The PCP prescribed a seven-day Medrol therapy pack. *Id.*

- Three months later, on April 21, 2021, Petitioner returned to her PCP for follow-up for her left arm pain and refill of her Celebrex. Exhibit 2 at 10. She reported that her arm was "still in pain" from her November 2020 vaccine. The PCP assessed Petitioner as suffering from a cramp or spasm, refilled her Celebrex, and referred her to orthopedics. *Id.*

- Approximately one week later, on April 29, 2021, Petitioner visited the orthopedist. Exhibit 6 at 82. In this record, both Petitioner's pain and vaccinations are listed as occurring on November 6, 2020, rather than the correct date of November 16, 2020. Attributing her pain to the vaccines she received, Petitioner reported that her "[p]ain started [the] very next day and continues." *Id.* Assessing her pain severity as five out of ten, she characterized it as aching and tingling. *Id.*

- After reviewing x-rays showing no abnormalities and observing "motion restriction in all planes," the orthopedist diagnosed Petitioner with left shoulder pain and adhesive capsulitis. Exhibit 6 at 83. He prescribed physical therapy ("PT"), adding that Petitioner should consider manipulation under anesthesia if her symptoms did not resolve. *Id.*

- On May 5, 2021, Petitioner attended her first PT session. Exhibit 6 at 51-55. She again attributed her left shoulder pain to the vaccines she received, stating that "shortly following those injections she started having severe shoulder pain." *Id.* at 53. She described pain that worsening when reaching across and overhead and improved with rest. *Id.*

---

[6] Celebrex is a "trademark for a preparation of celecoxib, . . . a nonsteroidal anti-inflammatory drug of the COX-2 inhibitors group, used for symptomatic treatment of osteoarthritis and rheumatoid arthritis, administered orally." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 312 (32th ed. 2012).

- Upon examination, Petitioner exhibited some range of motion ("ROM") pain and weakness. Exhibit 6 at 54. Noting that he could not rule out rotator cuff pathology, the therapist stated that he observed no labral related symptoms. *Id.* He set PT goals and provided Petitioner with a home exercise program ("HEP"). *Id.* at 42.

- Petitioner attended three more PT sessions in May 2021, showing only some slight improvements in ROM. Exhibit 6 at 39-50.

- On May 27, 2021, Petitioner returned to the orthopedist. Exhibit 6 at 35-38. The orthopedist assessed Petitioner as "ha[ving] gained some active motion, but still ha[ving] limited painful motion." *Id.* at 37. He listed manipulation under general anesthesia followed by further PT as the next step. *Id.*

- On June 21, 2021, Petitioner underwent a left shoulder manipulation. Exhibit 6 at 34. Following the administration of general anesthesia, full ROM was achieved, and Petitioner was administered a steroid injection into her shoulder joint. She "left the operating room in good condition." *Id.*

- Thereafter, Petitioner attended five additional PT sessions. Exhibit 6 at 8-28. At her last PT session on July 6, 2021, she reported a dull ache at a level of one out of ten. *Id.* at 9-10. Noting Petitioner was "responding well to MT[7] with reduced pain and increased mobility," the therapist assessed Petitioner as having "significantly increased all ranges of motion . . . [and meeting] all goals, except for one.[8]" *Id.* at 10.

- The next day, on July 7, 2021, Petitioner returned to the orthopedist, reporting dull, aching pain at a level of three out of ten. Exhibit 6 at 6. Upon examination, Petitioner exhibited "near full active/passive motion, . . . [and] only slight internal rotation deficit" when the orthopedist placed her arm behind her back. *Id.* at 7. The orthopedist characterized Petitioner as "doing well" and instructed her to continue her HEP as needed. *Id.*

---

[7] This abbreviation appears to be a reference to manual therapy which is mentioned just above the entry in question. *See* Exhibit 6 at 10.

[8] This goal, listed as UTBR, may be a reference to greater tuberosity tenderness. *Compare* Exhibit 6 at 10 (abbreviation) *with id.* at 11, 50 (lists of goals).

- Updated medical records show only subsequent chiropractic treatment for back and knee pain (Exhibit 18), and primary care treatment of unrelated conditions (Exhibit 19).

- Two of the signed declarations Petitioner provided address the specifics surrounding the information contained in her vaccine record (Exhibit 11) and the basic requirements of Section 11(c) (Exhibit 12).

- In her first declaration, signed on September 25, 2022, Petitioner described her injury and symptoms in detail. Exhibit 10. She reported feeling soreness when she woke the morning after her vaccinations, and left shoulder pain when performing certain movements such as reaching into the refrigerator for the milk. *Id.* at ¶ 2. Stating that she continued to feel pain over the next few days, Petitioner maintained that she was reluctant to seek medical care in part due to the ongoing COVID pandemic. *Id.* at ¶¶ 3-4. Petitioner attested that she finally experienced improvement after the lidocaine injection and manipulation (*id.* at ¶ 8), but still "experience[d] some pain from time to time" (*id.* at ¶ 9).

- A cardiologist in New York City (Exhibit 13 at ¶ 1), Petitioner's son confirmed that she "reached out to [him] on multiple occasions beginning in November 2020 with complaints of severe left arm pain and limited range of motion after receiving the flu and pneumonia vaccines" (*id.* at ¶ 2). He echoed Petitioner's claims related to her initial reluctance to seek treatment and medical care she received. *Id.* at ¶¶ 3-5. He explained that his mother related this information to him, complaining of her left arm pain for the majority of time during their phone calls at that time. *Id.* at ¶ 6.

- Petitioner's neighbor recalled her informing him of her vaccine-related injury in November 2020. Exhibit 14 at ¶ 1. He attested that he could tell Petitioner was in pain from her facial expressions and observed difficulties performing certain tasks (such as carrying laundry or groceries). *Id.* at ¶ 2. The neighbor stated that he helped Petitioner with these tasks for several months. *Id.*

- An attorney (for whom Petitioner provided word processing and secretarial services on a part-time basis) recalled her describing her pain, from the vaccines she received, in November 2020. Exhibit 15 at ¶¶ 1-2. He echoed Petitioner's assertions regarding her initial reluctance to seeks treatment. *Id.* at ¶ 3.

The record as a whole supports Petitioner's description of left shoulder pain beginning around the time of her vaccinations. When seeking treatment from her PCP, orthopedist, and physical therapist, Petitioner consistently attributed her left shoulder pain to the flu and pneumococcal conjugate vaccines she received a few months earlier. Exhibit 2 at 15, 10; Exhibit 6 at 82, 53 (in chronologic order). At her second visit to the orthopedist, on April 29, 2021, Petitioner stating that her pain began the morning after vaccination, placing onset within 48 hours of vaccination. Exhibit 6 at 82.

Although Respondent correctly observed that this second appointment with the orthopedist occurred more than six months post-vaccination, the lack of further details in Petitioner's earlier medical records can be attributed, at least in part, to the cursory nature of her PCP's medical records. A review of those records show they contain only very basic information regarding Petitioner's treatment. *See generally* Exhibit 2. And Petitioner's clear attribution of her pain to the vaccinations she received even in those earlier records provides persuasive evidence of a close in time pain onset. *See,* e.g., Exhibit 2 at 10 (noting she was "*still* in pain" from her November vaccine[9] (emphasis added)).

While these entries were based upon information provided by Petitioner, they still should be afforded greater weight than more current representations, as they were uttered contemporaneously with Petitioner's injury for the purposes of obtaining medical care. The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528 (emphasis added). Information provided by Petitioner to a treater and contained in a contemporaneous record deserves weight, and should not be considered subjective merely because it *came* from a patient, rather than physician.

Furthermore, there is a dearth of medical record evidence supporting a later pain onset. And the fact that Petitioner's pain was not *immediate* is not lethal to Petitioner's claim, because a claimant only need demonstrate the onset of pain *within 48 hours* of vaccination.

Although Petitioner delayed seeking treatment for two months, that delay does not provide the strong evidence undermining onset that Respondent contends. It is common for SIRVA claimants to delay treatment, thinking his/her injury will resolve on its own. Additionally, Petitioner was not seen during this 64-day period for any other illness or

---

[9] Although this entry mistakenly references only a single vaccine, this simple error does not diminish the probative value of the provided information. *See* Exhibit 2 at 10. Both vaccines Petitioner received are covered by the Vaccine Program. *See* 42 C.F.R. § 100.3(a) XII.A. (pneumococcal conjugate vaccination) & XIV.B. (influenza vaccination).

medical condition. Such intervening treatment evidence can in many cases either corroborate a petitioner's claim or undermine it – but it is totally absent here.

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

### III.     Additional Requirements for Entitlement

### A.     Legal Standards

In addition to requirements concerning the vaccination received, the pain onset (discussed above in Section II), symptoms duration, and the lack of other award or settlement,[10] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Hep B vaccine. 42 C.F. R. § 100.3(a)(VIII)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

---

[10] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

## B.    Analysis

Respondent has stated no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the flu and pneumococcal conjugate vaccines. There is no evidence of prior left shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(i), (iv) (first and fourth QAI criteria). And Petitioner exhibited pain and limitations in ROM solely in her left, injured shoulder. *E.g.,* Exhibit 2 at 15, 10 (PCP visits); Exhibit 6 at 82, 53 (orthopedic and PT records); *see* 42 C.F.R. § 100.3(c)(10)(iii) (third QAI criterion).

As I have determined in this ruling, the record supports a finding that Petitioner suffered pain within 48 hours of vaccination. *See supra* Section II.B.; 42 C.F.R. § 100.3(c)(10)(iii) (second QAI criterion). Additionally, the medical records show Petitioner suffered the residual effects of her injury for more than six-months. Exhibit 6 at 37 (continued limitations in ROM at the May 27, 2021 orthopedic visit); *see* Section 11(c)(1)(D)(i) (six-month severity requirement). And the vaccine record shows Petitioner received the flu and pneumococcal conjugate vaccines at a Walmart Pharmacy in Little Rock, Arkansas. Exhibit 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Furthermore, there is no evidence that Petitioner has collected a civil award

for his injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### IV.   Appropriate Amount of Compensation

Although I have found Petitioner entitled to compensation, I do not expect the amount awarded for Petitioner's past pain and suffering to be significant (although it may well be closer to the six-figure sum often awarded in cases involving surgery). Throughout the medical records, Petitioner reported moderate pain levels, from three to five, and often only in association with movement. Despite the slow progress gained from PT sessions in November and December 2020, Petitioner received good relief from the manipulation and injection she received in June 2021, and only five PT sessions attended thereafter. And this procedure is less invasive than arthroscopic surgery.

Still, Petitioner received little relief from her initial PT sessions in November and December 2020. And her reluctance to seek medical care during late 2020 and early 2021, is understandable considering the worldwide COVID pandemic, ongoing since early 2020. Although not as involved as arthroscopic surgery, Petitioner's procedure still required the administration of general anesthesia, not often required in SIRVA cases. Thus, these factors equate to a moderate SIRVA Injury, albeit involving a light/limited surgical procedure.

### Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master