# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1396V

| | |
|---|---|
| SHERRY MATTHEWS, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: August 13, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA,* for Petitioner.

*Benjamin Rex Eisenberg, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On September 28, 2022, Sherry Matthews filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving influenza and pneumococcal conjugate vaccines on November 16, 2020. Petition at 1, 1 n.2, ¶ 2. After I determined Petitioner was entitled to compensation, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately one month after I determined Petitioner was entitled to compensation, the parties informed me that they had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed June 26, 2024, ECF No. 34.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$80,929.99, representing $80,000.00 for actual pain and suffering, plus the agreed-upon $192.76 for past unreimbursable expenses, and $737.23 for all vaccine-related Medicaid expenses.**

## I.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress

2

contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.   Prior SIRVA Compensation Within SPU[4]

### A.   Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2025, 4,983 SPU SIRVA cases have resolved since the inception of SPU more than ten years before. Compensation has been awarded in the vast majority of cases (4,817), with the remaining 166 cases dismissed.

2,744 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[5] In only 310 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[6] As I have previously

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] The remaining 2,073 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[6] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,403 cases) or stipulation (31 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

3

stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[7]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *310* | *2,403* | *31* | *2,073* |
| **Lowest** | $25,000.00 | $4,000.00 | $37,013.60 | $1,000.00 |
| **1st Quartile** | $67,020.04 | $60,000.00 | $90,000.00 | $30,000.00 |
| **Median** | **$91,290.04** | **$79,444.74** | **$115,772.83** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $106,293.26 | $161,501.20 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 310 SPU SIRVA cases in which damages were determined via reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $25,000.00 to $215,000.00, with $90,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[9] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[10]

---

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[10] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.    The Parties' Arguments

The parties agree Petitioner should be awarded $192.76 for past unreimbursed expenses, and $737.23 to satisfy the Medicaid lien in this case. Petitioner's Memorandum in Support of Damages ("Brief") at 10-11, 19-20, ECF No. 40; Respondent's Damages Brief ("Opp.") at 2 n.1, 13, ECF No. 41; Petitioner's Reply to Opp. ("Reply") at 7, ECF No. 42. Thus, the only area of disagreement is the amount of compensation which should be awarded for Petitioner's pain and suffering. Petitioner seeks $105,000.00, and Respondent argues for an award of $70,000.00. Brief at 19; Opp. at 2, 13; Reply at 7.

Characterizing her prior condition as healthy (Brief at 2) and her treatment as "lengthy and involved" (*id.* at 13), Petitioner argues that her SIRVA has greatly impacted

---

application of the statutory cap before any projected pain and suffering award is reduced to net present value).

5

her life, preventing her from returning to her work as a massage therapist (her profession for 33 years), following the COVID Pandemic. *Id.* at 11-12, 14-15. Relying upon her sworn declaration, and medical visits with a new PCP and orthopedic surgeon in July and August 2024, respectively, she asserts that she continues to suffer the residual effects of her SIRVA, more than four years post-vaccination. *Id.* at 8-10 (citing Ex. 10; Ex. 20 at 7-8; Ex. 21 at 8-9).

Petitioner favorably compares the facts and circumstances in her case to those suffered by the petitioners in *Bidlack* and *Selling*[11] - decisions involving the same procedure she underwent (a manipulation under general anesthesia) and featuring past pain and suffering awards of $100,000.00 and $105,000.00, respectively. Brief at 16-17. She also asserts that the severity and duration of her injury is similar to that of the petitioners in *Juno, Dezurik,* and *Weed*[12] - decisions involving arthroscopy surgery and awards within the same range. Brief at 17-18. Seeming to equate these procedures, she argues that the more immediate treatment sought by the petitioners in the cases involving arthroscopic surgery is offset by the timing of her injury – during the Pandemic, the greater impact on her personal life, and the longer duration of her injury. *Id.* at 18-19.

In contrast, Respondent insists that Petitioner's pain was moderate, and course of treatment was brief. Opp. at 7. Portraying her treatment as concentrated primarily in May and June 2021, when she attended a total nine physical therapy sessions prior to and after manipulation, Respondent asserts Petitioner experienced a "full recovery only eight months post-vaccination." *Id.* He discounts her return for treatment in July 2024, following a three-year gap, and emphasizes the less evasive nature of shoulder manipulation when compared to arthroscopic surgery. *Id.* at 7-8.

In addition to the two cases involving shoulder manipulations that Petitioner cite (*Bidlack* and *Selling*), Respondent offers *Boyd*[13] – a decision involving the same procedure, but with a pain and suffering award of $90,000.00, as instructive. He insists that the petitioners in all three cases suffered symptoms which were more severe, required greater treatment, and continued for a longer duration. *Id.* at 9-10.

---

[11] *Bidlack v. Sec'y of Health & Hum. Servs.,* No. 20-0093V, 2023 WL 2885332 (Fed. Cl. Spec. Mstr. Apr. 11, 2023); *Selling v. Sec'y of Health & Hum. Servs.,* No. 16-0588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019).

[12] *Juno v. Sec'y of Health & Hum. Servs.,* No. 18-0643V, 2022 WL 17850717 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) (awarding $100,000.00 for past pain and suffering); *Dezurik v. Sec'y of Health & Hum. Servs.,* No. 20-1357V, 2022 WL 5419845 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) (awarding $105,000.00 for past pain and suffering); *Weed v. Sec'y of Health & Hum. Servs.,* No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) (awarding $105,000.00 for past pain and suffering).

[13] *Boyd v. Sec'y of Health & Hum. Servs.,* No. 21-0850V, 2024 WL 4720106 (Fed. Cl. Spec. Mstr. Oct. 8, 2024) (awarding $90,000.00 for past pain and suffering).

Respondent also argues that "[c]omparisons in cases involving arthroscopic surgery are inapposite." Opp. at 10. To support this assertion, he cites my prior language regarding the more invasive nature of arthroscopic surgery. *Id.* at 10-11 (citing *Rafferty v. Sec,y of Health & Hum. Servs.,* No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020)). Claiming that manipulation under general anesthesia is not always indicative of severe pain levels but can be mandated "to prevent a patient from engaging in active resistance to movement, relax spastic muscles, and allow manipulation through a full range of motion" (Opp. at 11), Respondent contends that such treatment "sits at the mid-point between surgery and physical therapy" (*id.* at 12).

Regarding Petitioner's claim that her SIRVA impacted her ability to work, Respondent argues that "[g]iven [her] age, unrelated conditions, and medical conditions, it is unlikely that she would have continued to work as a massage therapist after 2021." Opp. at 13. He notes that at the time of her vaccination, Petitioner was 65 years old and working for a law firm, performing secretarial work. *Id.* at 12.

In her reply, Petitioner criticizes Respondent's general argument that awards which deviate from his assessment value of the case incentivize future petitioners to reject proposed proffers and thus, undermine the Vaccine Program's primary purpose of quickly, easily, consistently, and generously compensating injured persons. Reply at 2-3 (citing Opp. at 6 n.2). Rather, she claims it is Respondent who is significantly undervaluing Petitioner's pain and suffering award by proposing an amount ($70,000.00) that has routinely been awarded in SIRVA cases that did not require either procedure – *Kahler, Huber, Cavalier,* and *Morrison-Langehough*[14] and is $20,000.00 less than the *Boyd* award. Reply at 3-5.

Petitioner also criticizes Respondent's attempt "to significantly distinguish [manipulation under general anesthesia] from arthroscopic surgery to justify his proposed pain and suffering award" (Reply at 5), claiming that this stance conflicts with prior damages decisions and shows a lack of understanding of the seriousness of manipulation. *Id.* at 5-6. To support her assertion that the procedures are comparable, she cites an article warning of the potential ill effects of forced manipulation and stresses that the dangers of undergoing general anesthesia are equally applicable to both procedures. *Id.* at 6-7.

---

[14] *Kahler v. Sec'y of Health & Hum. Servs.,* No. 19-1938V, 2024 WL 1928451 (Fed. Cl. Spec. Mstr. Mar. 27, 2024); *Huber v. Sec'y of Health & Hum. Servs.,* No. 21-0091V, 2023 WL 8187306 (Fed. Cl. Spec. Mstr. Oct. 26, 2023); *Cavalier v. Sec'y of Health & Hum. Servs.,* No. 21-0389V, 2023 WL 5500404 (Fed. Cl. Spec. Mstr. July 25, 2023); *Morrison-Langehough v. Sec'y of Health & Hum. Servs.,* No. 19-1103V, 2022 WL 1863924 (Fed. Cl. Spec. Mstr. Apr. 14, 2022).

### IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the filed medical records, affidavits, and sworn declarations and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Ms. Matthews suffered a SIRVA injury accompanied by moderate to mild pain, with more significant limitations in ROM. The SIRVA resolved within approximately eight months, following treatment that consisted of oral steroids (Ex. 2 at 15); manipulation and steroid injection while under general anesthesia (Ex. 6 at 63); and a total of nine PT sessions prior to and following the procedure.[15] Although Petitioner insists that she continued to experience symptoms thereafter, she did not return for treatment (or even mention any left shoulder issues) until July 2024,[16] almost three years later and more than 18 months after the filing of her vaccine claim. Thus, the record does not support the longer course duration that Petitioner advocates.

Prior to vaccination, Petitioner suffered unrelated conditions which also caused her pain. In March 2016, she sought chiropractic treatment for moderate thoracic and back pain, characterized as "daily and intermittent," that began years earlier from an unknown cause, "possibly work." Ex. 3 at 9. Thereafter, she continued to attend chiropractic appointments, at least once per year, both prior to and after vaccination. *Id.* at 11-31. Petitioner's back pain (characterized as muscle spasms) was also mentioned in the primary care provider ("PCP") medical records from multiple visits in 2020, along with a history of arthritis and complaint of painful, stiff, and swollen joints in January 2020. Ex. 2

---

[15] Prior to undergoing manipulation, Petitioner attended four PT sessions. Ex. 6 at 35-55. She attended five PT sessions post-procedure. *Id.* at 9-27.

[16] Although Petitioner began treating with a new PCP in April 2024 (Ex. 20 at 54), she did not mention any left shoulder issues until a visit on July 19, 2024, when she requested pain medication and an orthopedic referral (*id.* at 7). At the April 2024 appointment, she discussed only her fibromyalgia and lower back pain - for which she had a medical marijuana permit. *Id.* at 50-55. On August 14, 2024, Petitioner was seen by an orthopedic surgeon, who instructed her to continue a home exercise program. Ex. 21 at 6-9.

8

at 37-38, 32, 27, 22 (in chronologic order). Petitioner was prescribed Celebrex[17] for cramps and muscle spasms in January 2020 (Ex. 2 at 38), and Mobic[18] (depicted as a refill) in June 2020 (Ex. 2 at 22).

Throughout the medical records, it is noted that these prior conditions interfered with Petitioner's work as a massage therapist. When she first sought chiropractic care in 2016, she reported that her thoracic and back pain was "aggravated by work at MT[19] and cooking" (Ex. 3 at 9) and "limits her giving massages to about 3 hours per day" (*id.* at 11). When complaining of joint pain in January 2020, Petitioner stated that her daily pain affected her ability to work "to a moderate degree." Ex. 2 at 27-28. During chiropractic visits in 2017 through early 2020, Petitioner sometimes attributed her increased thoracic and back pain and need for treatment to "working/giving massages" (*id.* at 23) and "standing after giving [a] long massage" (*id.* at 24). Thus, Petitioner's assertion – that she was unable to return to her job as a massage therapist *solely* because of her SIRVA, is unpersuasive.

Additionally, Petitioner's claim that her initial two-month delay in seeking treatment was not an indicator of the mildness of her symptoms, but rather due *only* to the ongoing Pandemic,[20] is similarly not supported by the record in this case. In June 2021 (now well after the start of the Pandemic), Petitioner visited her PCP for a four-month follow-up of her previously reported back pain. Ex. 2 at 20. Thus, Petitioner's delay can be attributed, at least in part, to the likelihood that her symptoms were not significant enough to warrant more immediate treatment.

Although there is no notation regarding the severity of her pain when Petitioner first sought treatment on January 2021, she appears to have either experienced milder symptoms initially or to have gained relief from the oral steroids prescribed at that visit. *See* Ex 2 at 15. She did not seek further treatment until more than three months later, on April 21, 2021. Ex. 2 at 9. Seen by an orthopedist on April 29, 2021, Petitioner reported pain at a level of five out of ten, was diagnosed with adhesive capsulitis, and referred to PT. Ex. 6 at 58-59. And she continued to report that same moderate pain level at four PT

---

[17] Celebrex is a "trademark for a preparation of celecoxib, . . . a nonsteroidal inflammatory drug of the COX-2 inhibitors group, used for symptomatic treatment of osteoarthritis and rheumatoid arthritis; administered orally." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 312 (32th ed. 2012).

[18] Mobic is a "trademark for a preparation of meloxicam" (DORLAND'S at 1171), "a nonsteroidal inflammatory drug used in the treatment of osteoarthritis; administered orally (*id* at 1126).

[19] Presumedly this abbreviation refers to massage therapy.

[20] The World Health Organization declared COVID-19 a pandemic on March 11, 2020. *See* Centers for Disease Control COVID-19 Timeline, at https://www.cdc.gov/museum/timeline/covid19.html (last visited July 29, 2025).

sessions and a PCP visit in May 2021. *Id.* at 35-55 (reporting pain levels of five, and in one case four).

Petitioner's pain lessened, however, during five PT sessions following the manipulation performed on June 21, 2021. Ex. 6 at 5-31. By her discharge from PT on July 6, 2021, she reported pain at a level of one out of ten, had "significantly increased all range of motion, . . . ha[d] met all goals," but one. *Id.* at 10. Still, Petitioner obtained this relief only after consenting to forced manipulation and the administration of a steroid injection while under general anesthesia – treatment which shows, at a minimum, that her ROM was markedly limited. Although not as invasive as arthroscopic surgery, this procedure is indicative of a more significant SIRVA. It is therefore a factor that should be weighed when determining any pain and suffering award, dictating a lesser award when compared to a similarly situated case involving arthroscopic surgery, and a greater award when compared to a case in which no procedure was required.

The surgical cases Petitioner cites are not supportive of the damages amount she requests. In addition to the need for arthroscopic surgery, those claimants had courses of illness with other factors - more immediate initial treatment, greater pain levels, and for *Dezurik* and *Juno*, more extensive PT- justifying a greater pain and suffering award. *Juno*, 2022 WL 17850717, at *2-4; *Dezurik*, 2022 WL 5419845, at *4-5; *Weed*, 2021 WL 1711800, at *3-5.

Although Petitioner's argument that her pain and suffering award should be greater than in cases *not* involving either type of procedure is credible, she did not identify the best examples to support this proposition. All mentioned cases involve other factors also supportive of a greater award – SIRVAs which were more severe, lasted for a longer duration, and were accompanied by serious complicating factors. *Kahler*, 2024 WL 1928451, at *12-15; *Huber*, 2023 WL 8187306, at *2-5; *Cavalier*, 2023 WL 5500404, at *5-6; *Morrison-Langehough*, 2022 WL 1863924, at *9-10. Thus, although I find Respondent's proposed amount of $70,000.00 is too low, it does not deviate from what would be fair by as wide a margin as Petitioner suggests.

When comparing Petitioner's case to others involving manipulation under general anesthesia, I find that an award less than the $90,000.00 featured in *Boyd* is appropriate, given the evidence. Although I recognized the occasional inconsistency and sometimes milder nature of the symptoms suffered by the *Boyd* petitioner, I assessed his symptom duration as four years. *Boyd,* 2024 WL 4720106, at *12-13. Petitioner argues that the *Boyd* petitioner's incarceration gave him ready access to medical care (Reply at 4-5), but I noted there that he "encountered some delays in receiving treatment due to circumstances outside of his control." *Boyd,* 2024 WL 4720106, at *12. For example, the *Boyd* petitioner was noy seen by an orthopedist until more than 20 months post-

vaccination. *Id.* at *3-4. And he did not gain the significant relief Petitioner did from her forced manipulation and injection. *Id.* at *4-5.

Also instructive is *Kent* - a case not involving either kind of procedure, but sharing several common traits. Like Petitioner in this case, the *Kent* petitioner delayed seeking treatment for several months, developed significant limitations in her ROM, and was ultimately diagnosed with adhesive capsulitis. However, the *Kent* petitioner's pain levels were more severe, and PT was more extensive (32 sessions over five months). *Kent v. Sec'y of Health & Hum. Servs.,* No. 17-0073V, 2019 WL 5579493, at *11-12 (Fed. Cl. Spec. Mstr. Aug. 7, 2019). And she relied upon PT only, due in part, to a fear of needles. *Id.* at *5.

Were it not for these differences, I would not equate these cases. Choosing to undergo any procedure involving general anesthesia, versus a reliance on PT only, is indicative of more severe pain and suffering. Here, they are sufficient to counter Petitioner's willingness to undergo the riskier, albeit ultimately successful, procedure of forced manipulation and steroid injection under general anesthesia. Thus, I find Petitioner should receive a similar pain and suffering: $80,000.00.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $80,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[21] I also find that Petitioner is entitled to $192.76 in actual unreimbursable expenses paid by Petitioner and $737.23 in vaccine-related Medicaid expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $80,929.99 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

---

[21] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

11

The Clerk of Court is directed to enter judgment in accordance with this decision.[22]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[22] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.